[No. 31622. Department Two. March 29, 1951.]

ALVA ROBERTS, *Respondent*, v. JOE SUNNEN, *Appellant*.[1]

*E. K. Marohn*, for appellant.

*Lee Teats* and *Ralph Teats*, for respondent.

HAMLEY, J.—Alva Roberts, the owner of an insurance agency, brought this action to recover $5,328.64, alleged to have been advanced for Joe Sunnen on account of insurance premiums. Sunnen, the operator of auto freight equipment, denied the essential allegations of the complaint. Defendant also cross-complained for six thousand dollars damages for the alleged failure of plaintiff to secure the cheapest and best insurance to be had covering defendant's operations. At the conclusion of the jury trial, the trial court dismissed the cross-complaint, and directed a verdict for plaintiff on the complaint in the sum of $4,783.61, representing unpaid premiums in the sum of $4,368.62, and interest from September 17, 1948, in the sum of $414.99. Judgment was entered accordingly, and defendant has appealed.

[1]Reported in 229 P. (2d) 542.

Appellant contends that there was substantial evidence tending to establish respondent's liability under the cross-complaint, and that it was therefore error to dismiss the cross-complaint. Relative to this contention, the evidence, when viewed in a light most favorable to appellant, discloses the following facts: Respondent is a licensed insurance agent who has been engaged in that business in Tacoma, Washington, since 1922. He represents some twenty or more insurance companies, and for this purpose maintains an office and employs assistants. One of the companies which he represents is General Casualty and Insurance Company of America, herein referred to as General Casualty.

Appellant has been engaged in the auto freight business since 1928, with his principal place of business in Tacoma. He operates pursuant to common and contract carrier permits issued to him by the state agency which regulates transportation by motor vehicle, now known as the public service commission. The statute applicable to such operation (Rem. Rev. Stat., Vol. 7A, § 6382-16 [P.P.C. § 281-37]) requires appellant to procure and file liability and property damage insurance from a company licensed to write such insurance in this state, or deposit such security, for such limits of liability and upon such terms and conditions as the state agency shall determine to be necessary for the reasonable protection of the public. During all of the time here in question, the rules and regulations of the state agency required, as the minimum amount of insurance, five thousand dollars for injuries to one person, ten thousand dollars for injuries to all persons in one accident, and five thousand dollars for property damage. Appellant, in addition to carrying this insurance required by statute, also carried collision, cargo, fire, theft and other types of insurance protection.

Prior to 1941, appellant carried his insurance with Northwestern Fire Insurance Company, through another agent. In that year one of respondent's salesmen stopped in at appellant's office several times and talked to Sunnen about

insurance. The latter finally decided to do business with respondent, and Roberts thereupon went to Sunnen's office, where they discussed the matter. Sunnen testified as follows regarding this initial conference:

"A. Well, when I first met Mr. Roberts, why, in regard to insurance, I talked to him about the insurance and explained it to him to the best of my knowledge what kind and what type of insurance—what kind of insurance I needed, and what kind of work I was doing, and aside from that, why, I let him take care of it. Q. Well now, by taking care of it will you enlarge on that—explain it? A. Well, in other words, you might say that I turned it all over to him to see that I was taken care of properly, and covered the way that I felt I should have been. Q. Well, you mean by covered, you mean that you wanted to be fully covered so far as the coverage—take for instance cargo insurance? A. Cargo, and liability, and fire and theft. Q. And property damage? A. And damage. Q. Collision? A. Collision. Q. In other words, according to your statement, and see if I am correct here, when you first came in contact with Mr. Roberts and turned over the insurance business to him you told him that you wanted to be covered by insurance. A. Yes. Q. And you left the choice of the companies to him?

"MR. TEATS: Your Honor, I object to that. He is testifying for the witness.

"THE COURT: The objection is sustained. It is leading.

"Q. Well, just how much direction did you give Mr. Roberts with reference to placing the insurance? A. Well, about all I did was to,—as I say, I told him what type of insurance I wanted, what type of work we were doing, and he says, 'All right, I will take care of it', and from there on I really didn't pay too much attention to it. I left it up to Alva Roberts. I figured he was giving me the type of insurance that I needed, and that was it."

According to Sunnen, Roberts began handling appellant's insurance requirements on June 14, 1941. The practice was for Roberts to secure policies of insurance for Sunnen, and then advance the premiums therefor to the insurance companies. Roberts then sought to collect from the insured. Roberts kept a running account with Sunnen. Sunnen had a large fleet of trucks, and when he ceased using any piece of equipment in his business, he was en-

titled to a credit or return of premiums. Likewise, when Sunnen placed additional equipment into service, he was charged for additional premiums. Roberts would confer with Sunnen in the latter's office from one to three times a month. A good deal of the business, however, was transacted over the phone with Roberts or one of his employees.

Roberts placed appellant's liability insurance, covering bodily injuries and property damage, with General Casualty. Policies of this kind, placed between June, 1941, and June, 1948, provided Sunnen with full coverage up to the face of the policy, no deductible feature being included. In June, 1948, a safety engineer employed by General Casualty, visited Sunnen and, among other things, suggested that a substantial saving could be made by adding a one-hundred-dollar deductible rider to the property damage clause of the liability policy. Roberts had never suggested such a possibility, and Sunnen, before this time, had not realized that a one-hundred-dollar deductible rider might be obtained.

Sunnen immediately took this up with Roberts, who, in turn, went to the Tacoma office of General Casualty and finally obtained a typewritten rider of this kind. This rider is dated July 27, 1948, and has been continued on renewal policies issued by General Casualty since that date.

Under the one-hundred-dollar deductible rider, the insured is required to assume all liability on property damage from one cent to one hundred dollars. He must, however, furnish the insurance company with notice of all accidents, regardless of the size of the property damage claim, and agrees to reimburse the company up to one hundred dollars, if the latter determines to settle a claim involving a larger amount. The premium on the property damage feature of policies containing such a rider is forty per cent less than the premium on policies providing for full property damage coverage.

Based on these facts, appellant contends that respondent is liable for the excess premiums paid in obtaining full coverage rather than one-hundred-dollar deductible, for the

years 1941 to 1948. In the cross-complaint, it is alleged that Roberts is the agent of General Casualty, and that liability arises by reason of the fact that appellant relied upon that company's agent to secure the cheapest and best insurance available. However, at the trial, and in the briefs and argument before this court, appellant asserted that, under the evidence, respondent was a broker or agent for the insured, as well as the appointed agent of General Casualty and other insurance companies.

Assuming, as appellant contends, that Roberts acted as agent or broker for Sunnen with respect to this insurance business, we have first to consider what duties and obligations Roberts assumed under that relationship. With respect to the terms and premiums of insurance policies, the applicable rule is stated in Couch's Cyclopedia of Insurance Law, as follows:

"§ 469. DUTIES AS TO TERMS AND PREMIUMS. Since it is the duty of an agent, employed to procure insurance for his principal, to exercise good faith and reasonable skill and ordinary diligence, it would seem that it would be his duty to make the insurance on the best terms he is able to obtain, and that, if he is a professional agent, he should be required to exercise the particular skill reasonably to be expected of such an agent, and have the knowledge as to the different companies and terms available with respect to the commission assumed by him. However, only good faith and reasonable diligence are required, and, in the absence of a showing of knowledge that better terms could have been obtained, it is sufficient to show that such faith and diligence were exercised, since, as, in effect, said by Story in his valuable work on Agency, to exact more is to go into the possibilities, and a mere possibility that the agent could have effected the insurance on more valuable terms does not render him liable, or show any want of good faith." 2 Cyc. of Insurance Law, Couch, p. 1332.

Appellant submitted no evidence tending to prove that one-hundred-dollar deductible property damage liability insurance was available from any insurance company in the area prior to July, 1948, when this rider was attached. Respondent, on the other hand, produced undisputed testi-

mony that this type of policy was wholly unobtainable prior to that time.

Roberts testified that no such rider was available before June, 1948. He indicated that the rider was permitted on that date only because General Casualty's safety engineer had created a situation which required an exception to that company's general policy. He also testified that since this controversy arose, he had made inquiries among other insurance companies, and had found only one which had ever permitted such a rider, and then in only one instance out of fifteen or twenty thousand policies.

Howard Seabury, branch manager in charge of General Casualty's Tacoma office, testified that this company never wrote or held itself out to write a one-hundred-dollar deductible policy of this kind until this rider was added to appellant's policy. He explained, as the reason for this, that such riders are not considered as good service to the policyholder, because few policyholders are equipped with claim-adjusting facilities. He also stated that such riders are objectionable from the standpoint of the company. The reason for this is because if such a rider were attached, there is danger that the policyholder would be careless in notifying the insurance company of what seemed to be small losses, but which might turn out to involve substantial personal injury claims for which the insurance company would be liable. The witness drew a clear distinction between collision insurance where fifty or one-hundred-dollar deductible clauses are common, and property damage liability policies, where such clauses were practically nonexistent prior to the issuance of the one in question.

In view of this undisputed evidence, we are of the opinion that appellant did not make a case for the jury on the indispensable point that respondent failed to exercise good faith, reasonable skill, and ordinary diligence in obtaining the best terms available.

In this respect, the instant case is clearly distinguishable from *Colpe Inv. Co. v. Seeley & Co.*, 132 Cal. App. 16, 22 P. (2d) 35, relied upon by appellant. There the agent was

charged with failing to obtain the best insurance rate available because he had neglected to have coinsurance clauses, permitting lower rates, attached to the policies. The insured produced expert testimony to the effect that the practice of writing coinsurance was known to all brokers, who ought to advise their principals with reference to the effect of such clauses and as to the discount allowed in such instances. The court properly held that, in view of this showing, the question of whether the agent had exercised good faith and reasonable diligence was a question for the jury. In the case before us, however, no evidence whatever was presented, tending to show that the lower-rated one-hundred-dollar deductible policy was available.

Having reached the conclusion stated above, it is not necessary for us to decide whether Roberts was in fact an agent or broker for Sunnen. It is likewise unnecessary for us to decide whether there is substantial evidence tending to indicate that one-hundred-dollar deductible is in fact the "cheapest and best" kind of property damage liability insurance, considering the lessened protection thereby afforded. We are of the opinion that the cross-complaint was properly dismissed.

Appellant also assigns as error the action of the trial court in directing a verdict for respondent upon its complaint. The original amount sued for was $5,328.64, together with interest thereon at six per cent per annum from July 20, 1948.

In support of this claim, respondent introduced in evidence the duplicate copies of the original insurance premium invoices covering all premiums alleged to be unpaid. He also introduced duplicate copies of the original credit slips which had thereafter, in some cases, been issued where circumstances called for a reduction in premiums previously charged. These invoices and credit slips contained the effective date of the policy, the number of the policy, the name of the insurance company, the type of coverage, the period for which the policy would run, and the premium or credit, as the case might be. These were original

records, from which respondent later made up his ledger and account books, and on the basis of which he settled with the insurance companies. The net amount owing as of September 17, 1948, as shown by these records, was $4,-368.62.

Respondent also attempted to prove that the sum of $660.24 was owing as additional premiums due under an audit provision of the policies. However, this item was withdrawn before the close of the case, and is not involved in this appeal.

Appellant's answer placed the allegations of the complaint in issue. Appellant objected to the introduction of the duplicate original invoices and credit slips on the ground that they were not the best evidence. The objection was overruled, and this ruling by the trial court has not been assigned as error. Appellant submitted a number of canceled checks made out to respondent, and testified that they were in payment of insurance. He did not, however, testify that they were in payment of premiums for which respondent here seeks recovery. Respondent, on the other hand, traced each check, showing that appellant had been given full credit for each. This testimony was not disputed or rebutted.

Appellant's specific argument here seems to be that the directed verdict for respondent was based upon the recital that "there being no dispute over the balance owing . . . ," respondent was entitled to recovery. Appellant asserts that he has not "waived or stipulated" the balance, and therefore the balance *is* in dispute and should have gone to the jury.

The language of the directed verdict relates not to the appellants' state of mind regarding the balance, but to the state of the evidence. There was no dispute in the evidence as to the balance due, and the directed verdict was therefore proper.

The judgment is affirmed.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and GRADY, JJ., concur.